Filed 9/29/20  P. v. Amis CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071151 |
| v. | (Super.Ct.No. RIF1602001) |
| KESHAWN MARQUIS AMIS, | ORDER MODIFYING OPINION; AND DENIAL OF PETITION FOR REHEARING |
| Defendant and Appellant. | |
| | [NO CHANGE IN JUDGMENT] |

The petition for rehearing filed by appellant on September 18, 2020, is denied.

The opinion filed in this matter on September 4, 2020, is modified as follows:

First sentence of the first paragraph of the opinion is modified, inserting footnote No. 1 after the word "trailer," as follows:

1

"Defendant and appellant Keshawn Marquis Amis and his friend Brandon Bobb went into a trailer[1] in the middle of the night where Jane Doe was sleeping."

All subsequent footnotes are renumbered accordingly.

Except for these modifications, the opinion remains unchanged. The modifications do not effect a change in the judgment.

MILLER

Acting P. J.

We concur:

CODRINGTON

J.

FIELDS

J.

---

[1] The victim called the structure a "camper" but the structure also had attributes of a "trailer." We refer to the structure as a trailer in this opinion but clarify in our argument, *post*, that regardless of the term used for the structure, it was an inhabited dwelling."

Filed 9/4/20  P. v. Amis CA4/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E071151 |
| v. | (Super.Ct.No. RIF1602001) |
| KESHAWN MARQUIS AMIS, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Godofredo Magno, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Keshawn Marquis Amis and his friend Brandon Bobb went into a trailer in the middle of the night where Jane Doe was sleeping.  When she

1

turned on the light in the trailer because her dog was barking, they rushed to her bed and they both held Doe down. Defendant inserted his finger into Doe's vagina. Bobb took Doe's laptop and they both ran out. Defendant was convicted of forcible sexual penetration, sexual penetration in concert, first degree robbery, and the special allegation that the sexual penetration by force was committed during the commission of a burglary.

Defendant claims on appeal that: (1) The trial court erroneously excluded evidence that Bobb had a prior encounter with Doe, during which Bobb committed a sex act in front of Doe, to show Bobb, not defendant, committed the sexual penetration against Doe; (2) the prosecutor committed misconduct during closing argument; (3) insufficient evidence was presented to support the special allegation under Penal Code[2] section 667.61, subdivision (d)(4), sexual penetration during the commission of a burglary, as it was not shown that defendant entered the trailer with the intent to commit a sexual offense; (4) the imposition of the $10,000 parole revocation fine pursuant to section 1202.45 must be stricken; and (5) the trial court erred by imposing fines and fees at sentencing without conducting a hearing to determine his present ability to pay pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). In supplemental briefing, defendant further contends that the section 667.61, subdivision (d)(4), allegation must be stricken and his first degree robbery conviction must be reduced to second degree robbery because the trailer in which Doe was living was not a "trailer coach" within the meaning of the first degree robbery and first degree burglary statutes.

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL HISTORY

### A.     PROCEDURAL HISTORY

Defendant was convicted of committing forcible sexual penetration (§ 289, subd. (a)(1); count 1).  It was further found true for count 1 that defendant entered an inhabited dwelling with the intent to commit a sexual assault within the meaning of section 667.61, subdivision (d)(4).  In addition, he was convicted of forcible sexual penetration in concert (§ 264.1, subd. (a); count 2) and first degree robbery (§ 211, count 3).

On June 14, 2018, defendant was sentenced to 25 years to life pursuant to section 667.61, subdivision (d)(4), on count 1.  Defendant was also sentenced to 25 years to life on count 2, which was stayed under section 654.  A determinate term of four years on count 3 was imposed to run consecutive to count 1.  Defendant received a total state prison sentence of four years plus 25 years to life.[3]

### B.     FACTUAL HISTORY

#### 1.     *THE PEOPLE'S CASE-IN-CHIEF*

On April 19, 2016, 29-year-old Jane Doe lived on Country Club Drive in Riverside.  She had been living in a trailer on the side of the house where her grandparents lived for approximately seven months.  She lived there while she was attending college.  The trailer was behind a closed and locked gate; the gate was always closed and locked.

---

[3] Additional fines and fees were imposed, which will be discussed, *post*.

Doe had a small dog that stayed in the trailer with her. She described the trailer as the type that attached to a truck to pull it. She called it a "camper." The bed she slept on was in the front of the trailer and was raised. The trailer had a bathroom, which was not functioning, and there was a kitchen with a table, a refrigerator and a microwave. She slept in the trailer and kept her clothes in the trailer.

On April 18, 2016, Doe went to bed around 10:00 p.m. Around midnight on April 19, she woke up to her dog viciously barking. He usually did not bark in that way. She was able to return to sleep and her dog stopped barking. Around 2:00 a.m. she again awoke because her dog was barking. She turned on the light in the trailer. She saw two Black men standing toward the back of the camper and they charged at her. They were already inside the trailer when she turned the light on.

One of the men tried to hold her down by her shoulders but she was able to move to the corner of the bed away from him. The other man jumped up onto the bed. He tried to hold down her head and her hands to subdue her. She started screaming and the man who was trying to hold down her head tried to shove something in her mouth. The other man who at first tried to hold her down by her shoulders, and then possibly held down her legs, had moved away from the bed.

The man on the bed, who had been holding down her head, then stuck his finger inside her vagina for just a minute. She froze for a minute and then she started fighting to get him off of her. She could see the other man's face who was away from the bed; his "expression looked shocked almost." She started screaming again and the man on the bed said to her, "Shh, be quiet." Doe was only wearing a T-shirt and no underwear. Doe

4

kicked at the man who had penetrated her and pulled his hair. She pulled out a clump of his hair. She was certain that the clump of hair was from the man who penetrated her.

The man who was standing in back away from the bed grabbed her laptop and ran out of the trailer. The man on her bed stayed a few minutes longer. Doe could not identify defendant in court as one of the men. She could not pick either of the men out of a six-pack photographic lineup shown to her prior to trial.

Doe's wallet and car keys were not taken. Her laptop was the only thing taken. The man assaulting her was wearing a black visor. The visor fell off and was left in the trailer. The two men did not speak with each other while they were in the trailer. She estimated they were in her trailer for approximately four minutes.

On April 19, 2016, Christian Allan was living with his parents on Country Club Drive in Riverside. At around 2:00 a.m., he and his brother were in their backyard. Allan heard someone continuously screaming but could not at first determine where it was coming from. They went out to the front yard and saw two Black men run from a nearby house. The house where the two men ran from had a trailer next to it and Allan believed a woman was staying in the trailer. One of the men was carrying something that looked like a laptop.

The two men ran to their car—a four-door Honda Accord—which was parked in front of Allan's house. The man with the laptop got into the passenger's side. The man who got into the driver's seat appeared to have dreadlocks that were pulled up on his head. Allan's brother tried to stop the two men by kicking the car on the driver's side. The car drove away fast and ran through a stop sign.

5

Doe went to the hospital for a sexual assault exam around 6:30 a.m. on April 19. Doe's entire body was examined and numerous photographs were taken. A vaginal exam was completed. Doe sustained scratches on her arm during the struggle. She had scratches on her neck from the man that held down her neck. She had a laceration on her finger and injury to her lip. Doe had a small abrasion at the entrance of her vagina consistent with penetration by a finger. Multiple swabs were taken from Doe.

Allan identified a Honda Accord that belonged to defendant as the one he saw that night. Defendant was found driving the Honda Accord on April 24, 2016. It was searched and documents belonging to both Bobb and defendant were found in the car. There was a dent on the driver's side consistent with it being kicked. Bobb was arrested on April 22, 2016. A buccal swab was taken from Bobb. Defendant was interviewed by Riverside Police Detective Rita Cobb and a buccal swab was taken from defendant. Bobb's hair at the time of his arrest was short and it would have been difficult to pull out. He had some patches on his head where hair was not growing.

The clump of hair found on Doe's bed was analyzed for DNA evidence. It was compared to the buccal swabs from defendant and Bobb. The hair appeared to all have come from the same person. The hair was from a male. The hair samples did not match Bobb. The hair samples matched the DNA sample taken from defendant.

2.    *DEFENSE*

Defendant testified that in the early morning hours of April 18, 2016, his girlfriend Mary, gave birth to their baby and he was up all night with her. He was home during the day. On the night of April 18, he and Bobb went to the gym together until around 12:30

6

a.m.  They then went to get food.  On their way home, Bobb told him that he had left some belongings at his ex-girlfriend's house and wanted to stop by her house.  Defendant had never met Bobb's ex-girlfriend.

Defendant drove Bobb in his Honda Accord.  Bobb's friend Isaac was with them.[4] When they arrived at the house that Bobb identified as belonging to his ex-girlfriend, defendant stayed in the car while Bobb and Isaac went to the house.  A few minutes later, they both came running to the car and Bobb had a laptop in his hand.  Four or five "big guys" ran from a neighboring house ran after them and started kicking at defendant's car. He quickly drove away.  Defendant dropped Bobb and Isaac off at home.

Defendant had a brush in his car and Bobb used it prior to entering the trailer. Bobb cut his hair before he was arrested on April 22; it was longer on the night of April 19.  Bobb was wearing a visor.  Defendant insisted the hair found in Doe's trailer belonged to Bobb.

Defendant saw Doe for the first time when she testified at trial.  He was not in the trailer and did not take her laptop.  When defendant spoke with Detective Cobb when he was arrested, he never admitted that he entered the trailer.  Defendant insisted that when he was interviewed by Detective Cobb, she was forcing him to say things that were not true.  He had trouble understanding what was being said to him by Detective Cobb during the interview.

---

[4] Defendant had never mentioned that a person named Isaac was with them prior to trial.

7

Defendant had two children with Mary, who was 18 years old at the time of trial; defendant was 22 years old. Mary had recently claimed that defendant assaulted her while she was sleeping by forcibly trying to sexually penetrate her when she was 16 years old. Defendant denied that he sexually or physically assaulted her. He insisted she was making such claims to keep him from his children. Defendant first got together with Mary when she was 15 years old and he was 19 years old. She was pregnant as a minor by him twice.

Several of defendant's family members and neighborhood friends testified that defendant was mild mannered and was known to have a good character in the community. He was not a violent person. The charges in the instant case were not consistent with defendant's character.

3.    *REBUTTAL AND SURREBUTTAL*

Defendant was currently being investigated for trying to sexually penetrate Mary when she was 16 years old while she was asleep. Defendant's interview with Detective Cobb was played for the jury. Detective Cobb believed that defendant understood all of the questions posed to him.

Defendant told Detective Cobb that his Mary had given birth to their baby two weeks prior to the interview. Around April 18, 2016, defendant let Bobb borrow his car to go to the house of a girl Bobb had been dating, to get some of his belongings. Defendant first claimed to have stayed at Bobb's house with Bobb's friend, Isaac, while Bobb took the car.

8

Defendant then stated that Bobb wanted to borrow defendant's car because he had to get his belongings from a girl he knew or dated. Defendant agreed to go with him. Defendant walked with Bobb to the side gate of the house where the girl lived and then Bobb jumped over the fence. Bobb came running out of the girl's place and told him they had to leave. Detective Cobb told defendant there was video surveillance at Doe's house. Defendant then admitted he hopped over the fence with Bobb and went inside the trailer.

Defendant explained that when they went inside the trailer, Doe was asleep. She turned on the light and started screaming. Defendant told her to calm down. Defendant told Bobb to grab his belongings, but Bobb rushed at Doe and jumped on top of her. Defendant did not know what Bobb was doing and left the trailer. Defendant then admitted he may have touched her shoulders. Defendant took the laptop. Bobb was wearing a visor that came off in the trailer.

As defendant was leaving the trailer and Bobb was still inside, he heard the girl say "help me" and "rape." Detective Cobb then advised defendant they had collected DNA and that Detective Cobb knew that defendant had touched Doe. Defendant stated his DNA would be found around her shoulders. Bobb's DNA would be in her vagina. Bobb had told defendant that he stuck his whole hand in her vagina. Defendant ran to the car with the laptop; he later stated Bobb had the laptop.

Defendant admitted being by Doe's bed trying to calm her down. Defendant admitted that Doe pulled his hair and that any hair they found would belong to him. He adamantly denied that his DNA would be found on her vagina. Bobb had touched her.

9

Defendant retook the stand after his interview was played for the jury. Defendant insisted that he was innocent and that during the interview, he was trying to take the blame for someone else. He insisted he made a mistake by the people he was with and insisted he did not sexually assault Doe. He just wanted to be able to live his life and be happy. Defendant also admitted that his baby was born on April 9 but he insisted the baby was still in the hospital on April 18.

**DISCUSSION**

A.    BOBB'S PRIOR SEXUAL CONDUCT WITH DOE

Defendant contends his convictions in counts 1 and 2, and the special allegation of committing a sexual assault during a burglary, must be reversed based on the trial court's exclusion of evidence that Bobb had previously been in Doe's trailer and had committed sexual misconduct, which would have shown that Bobb sexually penetrated Doe.

1.    *ADDITIONAL FACTUAL BACKGROUND*

Prior to trial, the People filed a motion in limine to exclude evidence that Bobb had a prior sexual encounter with Doe. According to the offer of proof, Doe met Bobb at a bar and put his number in her phone. She met another "Bob," who she called " '[W]hite Bob,' " and she also put his number in her phone. Three months prior to the incident in this case, she texted Bobb thinking it was " '[W]hite Bob.' " When Bobb arrived, she realized her mistake. Bobb got upset. He pulled down his pants and masturbated until he ejaculated on her bed. After the incident, Doe changed Bobb's name in her contacts to " 'Creepy Rapist.' " Prior to the trial in this case, Bobb had pleaded guilty to sexual penetration in concert. The People sought to exclude the

10

evidence both as third-party culpability evidence and under the rape shield law pursuant to Evidence Code section 1103, subdivision (c)(4). In addition, the People sought to exclude evidence of a text conversation between Bobb and Doe's sister, in which he stated about masturbating at Doe's trailer, "I marked my territory. I'm a dog."

At the hearing on the matter, defendant's counsel agreed that he had not submitted a motion as required by Evidence Code section 782 in order to admit evidence of prior sexual conduct of Doe to attack her credibility. The People clarified that Bobb had pleaded guilty to count 2, sexual penetration by force in concert. Bobb did not admit to being the perpetrator of the sexual assault on Doe. Defendant's counsel argued, as to the admission of the evidence as third-party culpability evidence, that Bobb was with defendant and Bobb was the one who was the direct perpetrator of the sexual penetration. The trial court noted that the evidence may be relevant third-party culpability evidence to show that Bobb was the perpetrator of the sexual penetration.

Defendant's counsel further argued that Doe's prior sexual conduct was not being admitted so it should not be excluded under Evidence Code section 1103. Moreover, defendant's counsel offered to introduce the evidence without the fact that Doe had been at a bar when she met Bobb and that she referred to them as "[B]lack B[ob]" and "[W]hite B[ob]. Defense counsel made an offer that the evidence to be introduced would be that she mistakenly invited Bobb to her trailer, and that instead of Bobb leaving when Doe realized the mistake, he ejaculated in her presence. Defense counsel argued that he was allowed to argue defendant was not a perpetrator as a defense.

11

The trial court stated that Evidence Code section 1103 did not allow defendant to introduce the victim's prior sexual conduct, including third-party culpability evidence. Defendant's counsel responded that the text that Bobb "marked his territory" showed that Bobb believed he was able to do whatever he wanted to do to Doe. Defendant's counsel also asked the trial court to clarify whether the entire incident would be excluded or just the text messages from Bobb to Doe's sister.

The trial court ruled that it was excluding the entire incident based on Evidence Code section 1103. The text message referred to the incident so it would be excluded as well. Defendant's counsel clarified the incident was not being used to show Doe's consent to the act.

The trial court indicated that the admission was being denied without prejudice, and stated, "If at some point, testimony happens and you feel that it becomes relevant and it overcomes 1103[, subdivision] (c)(1), ask to be heard, and we'll take it up outside the presence [of] the jury and you can re-argue it. But at this point, I don't want it introduced without any further argument."

### 2. *ERRONEOUS EXCLUSION OF EVIDENCE*

" 'Relevant evidence' means evidence, *including evidence relevant to the credibility of a witness* . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*People v. Sanchez* (2019) 7 Cal.5th 14, 54.) Evidence Code section 1103, subdivision (c)(1) provides in pertinent part "Notwithstanding any other provision of this code to the contrary, and except as provided in this subdivision, in any prosecution under Section . . .

12

289 of . . . the Penal Code, or for assault with intent to commit, attempt to commit, or conspiracy to commit a crime defined in any of those sections, . . . opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness."

"A defendant may not introduce evidence of specific instances of the complaining witness's sexual conduct, for example, in order to prove consent by the complaining witness." (*People v. Fontana* (2010) 49 Cal.4th 351, 362.) "Evidence Code section 782, however, provides an exception to this general rule[ and . . . [¶] . . .] requires a defendant seeking to introduce evidence of the witness's prior sexual conduct to file a written motion accompanied by an affidavit containing an offer of proof concerning the relevance of the proffered evidence to attack the credibility of the victim." (*People v. Mestas* (2013) 217 Cal.App.4th 1509, 1513-1514, fn. omitted.) We review the exclusion of such evidence for abuse of discretion. (*People v. Chandler* (1997) 56 Cal.App.4th 703, 711.)

Here, defendant did not file a motion pursuant to Evidence Code section 782. However, defendant contends such motion was not required as the evidence sought to be introduced was not subject to Evidence Code section 1103. The evidence sought to be introduced was not Doe's sexual activity, but the prior criminal activity of Bobb to show he was the perpetrator of the sexual penetration against Doe, not to show she consented to the sexual penetration. Additionally, the purpose was not to attack Doe's credibility. We agree with defendant that such evidence was not made inadmissible by Evidence Code

13

section 1103 because it was not being admitted to attack Doe's credibility or to introduce her prior sexual conduct to show consent.

The trial court explicitly stated that it was excluding all of the evidence—the prior incident and the text message—pursuant to Evidence Code section 1103. The People make no argument that such evidence was properly excluded under Evidence Code section 1103. We need not consider the other arguments made by the prosecutor for excluding the evidence as this was not the basis used by the trial court and because we conclude that even though the trial court should not have excluded the evidence under Evidence Code section 1103, such exclusion was harmless.

### 3. *PREJUDICE*

The parties dispute the proper standard of review for prejudice. Defendant contends that his right to a fair trial and to present a defense were infringed requiring that this court determine prejudice under the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. The People contend that the erroneous exclusion of evidence is reviewed under state law error, e.g. it was not reasonably probable the error affected the verdict. (*People v. Chandler*, *supra*, 56 Cal.App.4th at pp. 711-712; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.) The application of ordinary rules of evidence does not implicate the federal Constitution. (*People v. Marks* (2003) 31 Cal.4th 197, 227.) The exclusion of evidence under Evidence Code section 1103 does not deprive a defendant of a fair trial. (*People v. Mestas*, *supra*, 217 Cal.App.4th at p. 1517.)

14

Here, defendant was not foreclosed from raising his defense that Bobb was the perpetrator of the offense. Defendant in his interview stated that Doe was either Bobb's ex-girlfriend or someone Bobb had dated, showing that there was some type of relationship between Bobb and Doe. Defendant also stated that Bobb admitted sticking his hand in Doe's vagina. Defendant's argument in its entirety was based on Bobb being the one who sexually penetrated Doe. The proper standard of review of the exclusion of evidence in this case is pursuant to *Watson*.

Here, the exclusion of the evidence of Bobb's prior encounter was not prejudicial as the jury reasonably could find that defendant was the perpetrator of the sexual offense against Doe despite Bobb's prior conduct. Doe indicated that when she turned on the light in the trailer, Bobb and defendant were already inside and immediately rushed at her rather than just taking the laptop. She was clear that the person who sexually penetrated her was the person from whom she pulled out a clump of hair. That hair conclusively belonged to defendant. Even with the evidence of Bobb's prior encounter, the jury could conclude that both Bobb and defendant entered the trailer, or just defendant, intending to sexually assault Doe.

Moreover, even if the jury had heard evidence of Bobb's prior conduct, and concluded that Bobb was the perpetrator, the jury was instructed that it could find defendant guilty as an aider and abettor. During rebuttal argument, the prosecutor argued that even if it was Bobb who sexually penetrated Doe, defendant was still guilty as an aider and abettor. Even if defendant did not sexually penetrate Doe, he held her down to

15

facilitate Bob's act. The jury was instructed it could find defendant guilty as a aider and abettor.

" 'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' " (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117) "Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*Ibid.*)

Here, the jury, by finding defendant guilty of sexual penetration in concert in count 2, found that defendant specifically intended to commit the sexual penetration, or he aided and abetted Bobb, which meant it had to conclude that defendant had the specific intent to aid the perpetrator with knowledge of his criminal purpose as well as the intent to encourage, facilitate or instigate commission of the offense. (See *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 497.) As such, the jury could find defendant guilty in counts 1 and 3 on the same principle that defendant aided and abetted Bobb.

Aiding and abetting equally applies to the special allegation that the sexual penetration was committed during the commission of a burglary. Subdivision (d)(4) of section 667.61 requires that the "[t]he defendant committed the present offense during the commission of a burglary of the first degree." Statutes requiring a defendant to "commit" an offense or act includes aiding and abetting. (*People v. Calhoun* (2007) 40 Cal.4th 398, 402-405.) Section 667.61, subdivision (d)(4), does not require personal commission of the crime. As such, the jury could have concluded that defendant shared Bobb's intent to

16

sexually assault Doe when they entered the trailer, to support the special allegation in section 667.61, subdivision (d)(4).

As such, had the jury been advised that Bobb had a previous encounter with Doe, it reasonably could find that defendant entered the trailer with the specific intent to aid and abet Bobb in the sexual penetration. This is evidenced by the fact that they rushed Doe when she turned on the light and said nothing to each other as they held her down together. They could have simply grabbed the laptop and left but they both rushed at Doe. As such, although the trial court erred by excluding the evidence, relying on Evidence Code section 1103, such error was harmless. In sum, it is not reasonably probable under the facts of this case that defendant would have received a more favorable verdict had the evidence been admitted. (*People* v. *Watson*, *supra*, 46 Cal.2d at p. 856.)

B.     PROSECUTORIAL MISCONDUCT

Defendant contends the prosecutor committed misconduct by advising the jurors that Bobb entered the trailer with the intent only to steal the laptop and not to sexually assault Doe. He contends this constituted misconduct based on the prosecutor's knowledge she had successfully excluded evidence prior to trial that Bobb had previously committed sexual misconduct in Doe's trailer.

1.     *ADDITIONAL FACTUAL BACKGROUND*

During closing argument, the prosecutor argued, "[Bobb] didn't know they were going to go in there and what [defendant] was going to do. [Bobb] had a purpose, to get that laptop and that's what he did." The prosecutor argued that Bobb was not near Doe when the sexual penetration occurred. The prosecutor argued, "She was very clear,

17

[Bobb] and [defendant] were not saying one thing to each other.  They weren't directing the other go get the laptop, it's over there, there wasn't this big old conversation going on like [defendant] wanted you to believe yesterday.  They weren't talking.  Why?  Because [Bobb] had a goal.  Get the laptop.  [Defendant] had a goal.  Sexually violate this girl."  During rebuttal argument, the prosecutor argued that even if it was Bobb who sexually penetrated Doe, defendant was still guilty as an aider and abettor.  It was clear that Bobb and defendant had to talk about going to Doe's house.  Even if defendant did not touch her, he held her down.

### 2.    *STANDARD OF REVIEW*

"The standards under which we evaluate prosecutorial misconduct may be summarized as follows.  A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.  Furthermore . . . when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44  (*Morales*).)

### 3.    *WAIVER*

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an

assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Here, defendant made no objection to the comments by the prosecutor. Such failure to object waives any claim of prosecutorial misconduct on appeal.

Defendant contends that an objection would have been futile because the trial court could not admonish the jury and reference the excluded evidence. " 'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if " 'an admonition would not have cured the harm caused by the misconduct.' " ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328-1329.)

An objection here would have been futile if, in fact, the prosecutor was relying on the fact that the evidence of Bobb's prior sexual misconduct was excluded from trial to support her argument, as the trial court could not admonish the jury referencing Bobb's prior conduct. However, the prosecutor reasonably could have relied on the admitted evidence that Bobb was the person who took the laptop, and Doe's testimony that identified defendant as the person who sexually penetrated her to make such an alternative argument that the sexual penetration was committed only by defendant. Although Doe did testify that the incident was a "blur" she was certain that the person from whom she pulled a clump of hair was the one who sexually penetrated her. Bobb was not the person who assaulted her. The prosecutor reasonably could argue that Bobb only went to the trailer to commit a robbery and not to commit another act of sexual

19

misconduct. This argument did not depend upon the excluded evidence and if defendant believed that such argument was based on the excluded evidence, the burden was on him to object to the argument so the prosecutor could clarify the basis of the argument. Such failure to object to the prosecutor's argument waives the claim of prosecutorial misconduct.

### 4. *MISCONDUCT*

Even if we were to consider defendant's claim, we would find that the prosecutor did not engage in "deceptive or reprehensible methods to attempt to persuade . . . the jury" or that resulted in an unfair trial. (*Morales*, *supra*, 25 Cal.4th at p. 44.) "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 396.) A prosecutor may commit misconduct by arguing about evidence that was excluded at his or her request. (*People v. Daggett* (1990) 225 Cal.App.3d 751, 758.)

The argument by the prosecutor was a fair comment on the evidence and did not require that the prosecutor rely on the excluded evidence. The evidence reasonably established that it was defendant who sexual penetrated Doe based on her pulling defendant's hair which was identified as belonging to him through DNA evidence. Further, the evidence established that Bobb took her laptop. Such argument did not violate defendant's state or federal constitutional rights.

20

This case differs from the cases cited by defendant. In *People v. Varona* (1983) 143 Cal.App.3d 566, the defendants sought to defend the charge of rape based on the victim being a prostitute and only accusing of them of rape when they refused to pay her. The trial court excluded evidence that the victim had a prior conviction for prostitution. (*Id.* at pp. 568-569} The prosecutor argued during closing argument that defendants had failed to present evidence to corroborate their defense and actually argued that the victim was *not* a prostitute. The appellate court found that the prosecutor's argument was misconduct because the prosecutor had full knowledge that the corroborating evidence had been excluded. (*Id.* at p. 570.)

Here, without the evidence that Bobb had previously sexually assaulted Doe, the prosecutor could still argue that Bobb only entered with the intent to commit robbery based on Doe's testimony that defendant was her attacker and that Bobb took the laptop. This case is unlike *Varona*, *supra*, and the other cases relied on by defendant. (See *People v. Daggett*, *supra*, 225 Cal.App.3d at pp. 757-758 [prosecutor committed misconduct when he made an argument, which allowed the jury to make an inference he may not have been able to make if the evidence regarding a prior child molestation had been admitted]; *People v. Frohner* (1976) 65 Cal.App.3d 94, 108-109 [prosecutor comments regarding the failure to call a witness that he knew was unavailable were improper].)

Moreover, the comments by the prosecutor here did not " 'infect[] the trial with such unfairness to make the conviction a denial of due process' " under the Fourteenth Amendment and did not involve " 'deceptive or reprehensible methods to attempt to

21

persuade' " the jury in violation of his state constitutional rights. (*Morales*, *supra*, 25 Cal.4th at p. 44.) Although the prosecutor made these comments during the opening argument, during rebuttal argument the prosecutor argued that even if Bobb did enter the trailer with the intent to commit a sexual assault, defendant would still be considered guilty based on aiding and abetting. The two had clearly talked about what they were going to do prior to going to the trailer. Defendant was equally as guilty as an aider and abettor. Considered together with the comments made in the rebuttal argument, the comments by the prosecutor during the opening argument did not render defendants' trial fundamentally unfair.

Moreover, although defendant contends the argument by the prosecutor was relied upon by the jury to convict him, it is not clear that the jury convicted defendant based on him being the perpetrator of the sexual penetration. The evidence reasonably supported that defendant aided and abetted Bobb. Further, the evidence of defendant's intent when he entered the trailer was established by the two men immediately rushing Doe when she turned on the light, and the lack of communication between the two while they were in the trailer. We conclude there was no prejudicial prosecutorial misconduct.

C.    INSUFFICIENT EVIDENCE OF SECTION 667.61, SUBD. (D)(4)

Defendant insists insufficient evidence was presented to support his conviction of the special allegation pursuant to section 667.61, subdivision (d)(4). He first claims that insufficient evidence supports that he entered the trailer with the intent to commit a sexual assault. In his supplemental opening brief, he further claims the trailer did not qualify as an inhabited dwelling to support the first degree burglary.

22

When the sufficiency of evidence is challenged on appeal, we must review "the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Davis* (2009) 46 Cal.4th 539, 606.) "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1004.)

1.    *INSUFFICIENT EVIDENCE INTENT TO COMMIT SEXUAL OFFENSE*

Defendant insists he did not enter the trailer with the intent to commit a sexual offense. The sexual assault was a spontaneous event which occurred when they were trying to keep Doe quiet.

The "One Strike" law creates an alternative, harsher sentencing scheme of either 15 or 25 years to life for certain enumerated sex offenses accompanied by additional specified factual findings. (*People v. Mancebo* (2002) 27 Cal.4th 735, 738.) Sexual penetration in violation of section 289 is one of the enumerated qualifying crimes under the One Strike law. (§ 667.61, subd. (c)(5).) Section 667.61, subdivision (d)(4), provides the circumstances under which a section 289 offense could be committed to fall under the One-Strike law as follows: "The defendant committed the present offense during the commission of a burglary of the first degree, as defined in subdivision (a) of section 460, with intent to commit an offense specific in subdivision (c)."

23

"The burglary circumstance is different from the other circumstances listed in section 667.61, subdivision (d) because it requires proof of specific intent on entry to a residence" (*People v. Hernandez* (2009) 180 Cal.App.4th 337, 349.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) Further, a person can aid and abet another person in the commission of a crime if he does so with "knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics added.)

Sufficient evidence from which the jury could reasonably infer that defendant had the intent when he entered the trailer to personally sexually assault Doe, or shared Bobb's intent to sexually assault Doe, was evident from the testimony of Doe and defendant's prior offense against Mary. When Doe turned on the light, defendant and Bobb were both standing at the end of the trailer. The two men did not speak but immediately rushed at her rather than grabbing the laptop and leaving. The laptop was not on Doe's bed, as evidenced by the fact that Bobb was able to grab it and leave while defendant was still on the bed with Doe. Moreover, defendant had committed this type of offense before when he tried to sexually penetrate Mary while she was sleeping. Finally, defendant's testimony and statements to Detective Cobb that he only intended to assist Bobb with taking the laptop was suspect. The jury reasonably could conclude that defendant had the intent to commit the sexual assault when he entered the trailer, or shared Bobb's intent to enter and commit a sexual assault.

24

Defendant insists the prosecutor argued that defendant was the only one between the two who possessed the intent to commit a sexual assault. However, as we have stated, the prosecutor also argued in the alternative that the jury could conclude Bobb committed the sexual penetration, and defendant held Doe down to facilitate Bobb. Substantial evidence supports that defendant had the intent or shared Bobb's intent to support defendant's conviction of violating section 667.61, subdivision (d)(4).

### 2. *INSUFFICIENT EVIDENCE INHABITED DWELLING*

In his supplemental brief, defendant contends that the trailer in which Doe was sleeping was not a "trailer coach" within the meaning of the first degree burglary statutes. The jury was instructed that in order to find that defendant committed first degree burglary, they must find Doe was in a trailer coach.

Section 459 states, "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, as defined in Section 21 of the Harbors and Navigation Code, floating home, as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, railroad car, locked or sealed cargo container, whether or not mounted on a vehicle, *trailer coach*, as defined in Section 635 of the Vehicle Code, any house car, as defined in Section 362 of the Vehicle Code, *inhabited camper*, as defined in Section 243 of the Vehicle Code, vehicle as defined by the Vehicle Code, when the doors are locked, aircraft as defined by Section 21012 of the Public Utilities Code, or mine or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary. As used in this chapter, "inhabited" means currently being used for dwelling purposes, whether

25

occupied or not. A house, trailer, vessel designed for habitation, or portion of a building is currently being used for dwelling purposes if, at the time of the burglary, it was not occupied solely because a natural or other disaster caused the occupants to leave the premises." Section 460, subdivision (a) states, "Every burglary of an inhabited dwelling house, vessel, as defined in the Harbors and Navigation Code, which is inhabited and designed for habitation, floating home, as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, or *trailer coach*, as defined by the Vehicle Code, or the inhabited portion of any other building, is burglary of the first degree." (Italics added.)

Vehicle Code section 635 defines a trailer coach as follows: "A 'trailer coach' is a vehicle, other than a motor vehicle, designed for human habitation or human occupancy for industrial, professional or commercial purposes, for carrying property on its own structure, and for being drawn by a motor vehicle. A 'park trailer,' as described in Section 18009.3 of the Health and Safety Code, is a trailer coach." Health and Safety Code section 18009.3 provides that a park trailer is designed for human habitation, it contains 400 square feet or less of gross floor area, is built on a single chassis and can be transported on public highways only with a permit.

Defendant insists that since section 459 refers to an "inhabited camper" but that term is not included in section 460, his burglary was in the second degree. He insists that the trailer occupied by Doe was not a "trailer coach" as that term is used in section 460.

However, defendant does not establish that the trailer occupied by Doe was a "camper" and not a "trailer coach." Doe testified that she had been living in the trailer for seven months when Bobb and defendant entered. She stated the trailer had a

26

bathroom, kitchen, a bed, and drawers.  Vehicle Code section 243 defines camper as "a structure designed to be mounted upon a motor vehicle and to provide facilities for human habitation or camping purposes.  A camper having one axle shall not be considered a vehicle."  At no time was there any argument that the trailer was a camper in the lower court.  The admitted exhibits show the trailer was free standing and was "mounted" on a motor vehicle.  The evidence supports that Doe was sleeping in a trailer coach within the meaning of Penal Coe section 460.

Moreover, even if we were to conclude that the structure inhabited by Doe is a "camper" this does not exclude it from the first degree burglary statute.  "[I]t is the element of habitation, not the nature of the structure that elevates the crime of burglary to first degree.  An 'inhabited dwelling house' as referenced in Pen. Code section 460, subd. (a), must be defined as a person's actual place of abode, regardless of the material of which it is built."  (*People v. Wilson* (1992) 11 Cal.App.4th 1483, 1489 [concluding a tent that had four walls, a roof, and was being used for sleeping and storage was a dwelling house for purposes of section 460, subdivision (a)].)  " '[A] popular test for whether a building is 'inhabited' is whether someone is using it as a temporary living quarters; in other words, whether the building is serving as the functional equivalent of a home away from home.  This characterization should be made from the perspective of the victim [citation], not the criminal."  (*People v. Long* (2010) 189 Cal.App.4th 826, 837.)

A similar argument regarding a recreational vehicle (RV) not being listed in section 460 was raised in *People v. Trevino* (2016) 1 Cal.App.5th 120 (*Trevino*).  In *Trevino,* defendant was convicted of first degree burglary of an inhabited dwelling based

27

on him entering a RV and committing corporal injury to his spouse.  Defendant argued on appeal that "the Legislature did not intend for burglary of an inhabited RV to be of the first degree because it specifically included the terms 'house car' and 'vehicle' in section 459, which generally defines burglary, but not in section 460, subdivision (a), which defines first degree burglary."  (*Id.* at pp. 123-124, fns. omitted.)  The *Trevino* court rejected the argument relying upon the California Supreme Court case of *People v. Cruz* (1996) 13 Cal.4th 764 (*Cruz*).

In *Cruz*, *supra*, 13 Cal.4th 764, the court noted that "[M]any structures that are enumerated in section 459 but not mentioned in section 460, most notably 'room,' 'tenement,' and 'apartment,' long have been understood as included in the term 'inhabited dwelling house' " (*Id.* at p. 778.)  It further noted, "inhabited dwelling house" has a "broad, inclusive definition" that depends on whether "the dwelling was being used as a residence."  (*Id.* at p. 776.)  As such, "terms used in section 460, like those used in section 459, are subject to a broad interpretation."  (*Id.* at p. 778.)

The *Trevino* court concluded that the RV which had been occupied for several years and had been used for sleeping and storing possessions, qualified as an "inhabited dwelling house" for purposes of section 460, subdivision (a).  (*Trevino*, *supra*, Cal.App.5th at p. 126.)

Here, Doe testified that she had been living in the trailer for seven months.  She kept her clothes and belongings in the trailer.  The trailer had a bathroom, kitchen and drawers.  As in *Trevino*, the trailer could be considered an inhabited dwelling house within the meaning of section 460.

28

Defendant relies upon *People v. Smith* (1995) 33 Cal.App.4th 1586 to support his claim that since Doe was sleeping in a "camper" he could not be convicted of first degree burglary. In *Smith*, the defendant approached the 14 year old victim while she was sitting at a bus stop. He gained her trust and she walked with him to his house. Once there, defendant forced her by knifepoint to get in "a camper attached to a pickup truck" that was behind his house. He then sexually assaulted her and took money from her pants. (*Id.* at pp. 1591-1592.) Defendant was convicted of first degree robbery as defined in section 212.5.[5] On appeal, the defendant argued that he could not be convicted of first degree robbery because the vehicle in which she was robbed was a "camper" and not a "trailer coach." (*Id.* at p. 1598.) The appellate court agreed that the "the Legislature intended to preclude a camper from the definition of trailer coach when defining trailer coach for purposes of robbery." It concluded "While the camper was outfitted with a stove, sink, counter and bed, the record does not reflect whether it had a toilet, and we cannot equate it with the type of trailer coach or other habitation contemplated by the Legislature." (*Id.* at p. 1599.)

---

[5] Section 212.5 defines first degree robbery as "Every robbery of any person who is performing his or her duties as an operator of any bus, taxicab, cable car, streetcar, trackless trolley, or other vehicle, including a vehicle operated on stationary rails or on a track or rail suspended in the air, and used for the transportation of persons for hire, every robbery of any passenger which is perpetrated on any of these vehicles, and every robbery which is perpetrated in an inhabited dwelling house, a vessel as defined in Section 21 of the Harbors and Navigation Code which is inhabited and designed for habitation, an inhabited floating home as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, a trailer coach as defined in the Vehicle Code which is inhabited, or the inhabited portion of any other building is robbery of the first degree."

*Smith* was decided prior to *Cruz* and did not consider whether the camper was an "inhabited dwelling house." Moreover, unlike the "camper" in *Smith,* here the trailer was equipped with a bathroom and was occupied by Doe who used is as her residence. The evidence supports that Doe was sleeping in an inhabited dwelling house to support defendant's conviction of violation of section 667.61, subdivision (d)(4).

D.     INSUFFICIENT EVIDENCE OF FIRST DEGREE ROBBERY

Similar to the prior argument, defendant also contends there was insufficient evidence of first degree robbery to support his conviction in count 3 and it must be reduced to second degree robbery.

"The terms 'inhabited dwelling house' or 'inhabited portion of any other building' have the same meaning in both the robbery and burglary statutes." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 316.) We have set forth the language of first degree robbery, *ante,* which includes the terms "inhabited dwelling house" and "trailer coach." (§ 212.5.) As such, as we have found burglary was of an inhabited dwelling house or trailer coach, there is sufficient to support the first degree robbery charge.

E.     PAROLE REVOCATION FINE

Defendant insists the trial court improperly imposed the parole revocation fine pursuant to section 1202.45 because it did not impose a restitution fine pursuant to section 1202.4, subdivision (b). The People concede the error. At the time of sentencing, the trial court waived the restitution fine recommended by the probation department based on the sentence received by defendant, but imposed and suspended the $10,000 parole revocation fine.

"Under subdivision (b) of Penal Code section 1202.4, a trial court *must* impose 'a separate and additional restitution fine' as part of the judgment of conviction entered against a criminal defendant, 'unless it finds compelling and extraordinary reasons for not doing so, and states those reasons on the record.' If the 'sentence includes a period of parole,' then the court *must* also impose a parole revocation fine [pursuant to section 1202.45], 'in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4.' [Citation.] This second fine . . . is automatically suspended unless the court later revokes parole." (*People v. Smith* (2001) 24 Cal.4th 849, 851.)

Since the trial court did not impose the section 1202.4, subdivision (b), restitution fine, and the People cannot raise any claim of error for the first time on appeal for failing to impose the restitution fine (*People v, Smith*, *supra*, 24 Cal.4th at pp. 851-852), the trial court erred by imposing the parole revocation fine. We can correct an improperly imposed revocation fine for the first time on appeal (*id*. at p. 852), and we will order that it be stricken.

F.      ABILITY TO PAY FINES AND FEES

Defendant claims, relying on *People v. Dueñas, supra,* 30 Cal.App.5th 1157, that the trial court violated his federal constitutional right to due process by failing to determine his ability to pay the fees imposed at sentencing. In addition, the Eighth Amendment mandate that excessive fines not be imposed was violated by the failure to determine his ability to pay the fines and fees. Defendant contends remand is necessary in order for the trial court to conduct an ability to pay hearing. The People contend that the sex offender registration fine should be examined in light of the excessive fines

31

clause, which does not consider an ability to pay. The People do not disagree with the conclusion in *Dueñas* that if a defendant is able to demonstrate an inability to pay fees and fines, it violates due process, but concludes defendant in this case cannot make such a showing.

At the time of sentencing, the trial court imposed an assessment fee of $90 pursuant to Government Code section 70373; a court operation assessment fee in the amount of $120 pursuant to Penal Code section 1465.8; and a sex offender registration fee imposed pursuant to Penal Code section 290.3, subdivision (a) in the amount of $800. The probation department had requested $1,500 in presentence incarceration costs but the trial court waived the fee in light of the sentence imposed. No restitution fine was imposed pursuant to Penal Code section 1202.4 and we have ordered the parole revocation fine to be stricken.[6] For purposes of this appeal, we will not consider the merits of defendants' claim as we find that the record supports defendant has the ability to pay.

On January 8, 2019, after sentencing in this case, the Court of Appeal issued an opinion in *Dueñas*, *supra*, 30 Cal.App.5th 1157. In *Dueñas*, the defendant was a probationer who suffered from cerebral palsy, was indigent, homeless, and the mother of young children. She requested and received a full hearing on her ability to pay the court

---

[6] The California Supreme Court will ultimately decide these issues of due process and excessive fines as it has granted review in *People v. Kopp*, review granted on November 13, 2019, S257844, (rejecting *Dueñas* analysis with respect to restitution fines, which should be analyzed under excessive fines clause but following *Dueñas* as to court fees and assessments.)

32

facilities fee, court operations fee, and the mandatory minimum restitution fine. Despite her clear inability to pay these fees and fine, the trial court mandatorily imposed them. (*Id*. at pp. 1162-1163.)

The appellate court held that the trial court violated defendant's right to due process under both the United States and California Constitutions by imposing court operations and facilities assessments pursuant to Government Code section 70373 and Penal Code section 1465.8, without making a determination as to the defendant's ability to pay even though such determination was not required by the statute. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.)

Even if *Dueñas* was correctly decided, and the trial court had to determine if defendant had the ability to pay the fines both under due process and the excessive fines clause of the Eighth Amendment, the record supports defendant has the ability to pay the fines and fees based on his prison wages rendering any conceivable constitutional error harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; see also *People v. Jones* (2019) 36 Cal.App.5th 1028, 1033.)

Defendant, who has received a sentence of 25 years to life plus four years, can earn wages in prison to pay the fines and fees. "Wages in California prisons currently range from $12 to $56 a month." (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Even if defendant only made $12 each month, in 25 years, he would have earned over $3,000, which would be more than enough to pay the fines and fees imposed. Additionally, defendant stated in his interview with Detective Cobb that he was working temporary jobs. This is unlike the situation in *Dueñas*, where the defendant had no

33

income and was disabled.  We find that even if *Dueñas* was properly decided, any conceivable constitutional error was harmless.

## DISPOSITION

The trial court is to directed to prepare a new minute order for the sentencing on June 14, 2018; prepare a new abstract of judgment to strike the parole revocation fine imposed pursuant to section 1202.45, and forward the new abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

FIELDS
J.

34